The fourth district appellate court of the state of Illinois has now convened. The Honorable John W. Turner presiding. Thank you. Good morning. We are here on case number 423. Excuse me. No, that's right. 423-0058. And counselors, before I have you identify yourselves for the record, I want to apologize that we're running late. We don't like that to happen, but on occasion it does. And we regret that we're 30 minutes later than we were scheduled to start this hearing, but we appreciate your indulgence. Anyway, would counsel for the appellant, please state your name for the record. Good morning, Your Honor's counsel from the state appellate defender on behalf of Mr. Mark Runyon. And thank you for accommodating me by doing this hearing via Zoom. And I was kept abreast of the court being a little late. So it was no problem. And thank you for accommodating me. Well, thank you. And counsel for the appellee, will you please identify yourself for the record? Good morning. My name is Pamela Wells. I represent the people of the state of Illinois. And the delay was no problem for my for myself either. Thank you, Your Honors. Well, thank you. And also, I know I said the number. I'm not sure I said the case name. If I did, I'll repeat myself. It's People v. Mark Runyon. And Mr. Zeeb, you may now proceed with your argument. May it please the court. I plan to focus my argument this morning, Your Honors, on the fitness restoration hearing and the sufficiency of the evidence argument, and also hope to touch a little bit on the ineffective assistance claim. But I'm happy, of course, to answer any questions this court may have on any of the four issues raised on appeal. This is a real sad case for many reasons. Frank Runyon was an elderly man. He was found severely beaten to death in his own home and for no apparent reason. And the only other person at home at the time he was found was his son, Mark Runyon, who had untreated schizophrenia at that point. Now, Mark was initially found unfit for trial due to his schizophrenia, due to his schizophrenia. But about six months later, after he'd been put on a specific medication protocol that included three psychotropic medications to specifically manage his mental illness and restore his fitness, a DHS doctor determined Mark to be fit and then issued a report. A few weeks later after that, at the fitness restoration hearing, the trial court determined Mark to be fit. But in making that fitness determination, Your Honors, the court failed to exercise the high level of scrutiny that that determination required. The determination can't be a rubber stamp, it can't be made by an expert, and it can't be made by the parties. Even if that stipulation to the report's admissibility was proper here, the cursory hearing just left too much ambiguity regarding one, whether the court even read that DHS report, and then two, and most importantly, whether Mark was taking his three medications as prescribed at that time, which was central to his fitness restoration. Let me ask you about the medications, Counsel. I believe you said that he was no longer taking Zoloft, but isn't that a drug that's known by the generic name of sertraline? And it does show he was taking that. Well, Your Honors, the record doesn't show that he was taking Zoloft until three years after the fitness restoration hearing, and Zoloft was not one of the three medications that was prescribed by the DHS doctor to restore his fitness. What about sertraline? Well, that is a medication that is prescribed for anxiety. It's the generic of Zoloft, isn't it? Right, but it doesn't treat his psychosis or schizophrenia. That was olanzapine, and it was three specific medications. How do we know what he was being prescribed at the time of the fitness hearing? We know what he was prescribed something close to three years prior, but what about at the time of the fitness hearing?  Yeah, well, that's part of the big problem here, Your Honors, is that we don't know. There's ambiguity there. What the DHS doctor in the report found was that his fitness was restored by giving the specific protocol of three medications. The olanzapine, the sertraline, and the lorazepam. At minimum, to comply with this court's decision in Gillen and the Supreme Court's decision in Lewis, the court had to at least put on the record and verify that he was taking these medications. If he wasn't, then there needed to be further inquiry as to why. All we have here is the court failed to put on the record that it read the report. It failed to verify that Mark was taking these three medications. This isn't just aspirin or some basic medication. These are psychotropic meds specifically prescribed to Mark to restore his fitness. What does a judge have to do? The report was in the record. It was, I think, filed with the motion that prompted the restoration hearing. If a judge gets it and reads it but doesn't say he read it, that's a problem? In this case, it is. Specifically, I think that all the court would have had to do here, and it's not much. We're not saying that there had to be an extensive, drawn-out hearing here. I think the court had to do three things. One, confirm on the record that it read the DHS report. That's easy. Two, confirm that Mark was taking the three medications as prescribed to restore his fitness. And then third, just provide a brief explanation as to the basics of its finding that Mark's fitness was restored. That process could take two to three minutes. It's not anything major. Counsel, while that might be best practice, is there any case that says to do otherwise is deficient? Well, yes. Gillen, this court's own holding and gilding, which we rely on here, talks about just where there's ambiguity and where it's unclear whether the court exercised its discretion to independently hold that the defendant's fitness was restored. I mean, we're talking about schizophrenia here. This is a lifelong illness that's characterized by hallucinations, major anxiety, a whole host of things. But it doesn't equate with unfitness, right? But that's the problem. We don't know. But what we do know is that he was found unfit. And that finding was then furthered by saying we believe we can restore his fitness. He was given three specific meds to treat his schizophrenia. You froze there for just a few seconds, counsel, so maybe repeat your last 25 seconds or so. Oh, I apologize. That wasn't reflected on my screen here. What we do know is that he was found unfit based on his schizophrenia with the hope that within 12 months his fitness could be restored with medications. And with those three specific meds, the DHS doctor determined that it was restored. So at the fitness restoration hearing a few weeks later, our position is, again, there's no magic required here. There's no extensive hearing required. But what we do need to know that the court exercised its high level of discretion here. This is a fitness restoration hearing where he's presumed unfit. This isn't an initial fitness determination where he's presumed fit. So because he's presumed unfit, that's why there's an extra level of scrutiny that's required to show that the court exercised its own independent judgment in reading the report, verifying that the defendant was taking the very meds that just weeks before the doctor determined were necessary to restore his fitness. So, again, that's very basic. Nothing extensive was required. But the procedure at this hearing was just too minimal and left too many unanswered questions. And for those reasons, the court should reverse this conviction and remand for a new trial. Going on to the second issue, if this court has no further questions on that issue, not only did the fitness restoration hearing result in unanswered questions, so did the state's evidence at trial. The state doesn't dispute that there was no direct evidence establishing that Mark was the person who inflicted the numerous and extensive injuries that caused Frank's death. There were no eyewitnesses here. There was no forensic evidence implicating Mark in this case. There was no theory of motive advanced. There was no admission by Mark. And this is critical. There were no injuries to his hands, face, or body. There was no sign of struggle in Frank's bedrooms. There's no struggle in the bedroom where Frank was found. There's just a whole lot of unanswered questions here. And Mark's mere presence in the home is just not enough to prove beyond a reasonable doubt that he was the one who inflicted these injuries upon Mr. Runyon. The door was locked, right? We don't know when it was locked, but it was locked at the time that Sarah Runyon and the officer arrived at the house, yes. At about 10, 20 or so in the morning, right? That's correct. There was a phone call placed from the decedent's phone just after 8 o'clock. Is that about right? I believe it was 8, 22 a.m., yes. A call to the neighbor, but it was unintelligible. Is that reasonable that the jury could infer that if the door was locked at about 20 after 10, that it was locked continuously from that point until earlier, until about 8, 20? Well, we don't know what happened the night before. We don't know what happened earlier in the morning. We don't know who locked the door. I mean, certainly it's only natural that in a case like this, where it's an elderly man who's severely beaten to death in his own home, that they'll want to find someone responsible for it. And I agree that... But if you acknowledge he was beaten to death in his own home, it doesn't really matter if there's signs of a struggle or anything else, right? Because we know he was beaten to death there. I think it does, because the injuries were so severe. And I think also key is that the victim had swelling to both hands, scabbing on his hand. The evidence indicates that there was a struggle there. And the fact that Mark had no injuries at all to his own hands, his own face, and his own body, and that there's no forensic evidence tying him, and the fact that there was no evidence of a struggle in the very bedroom he was found. There's just a whole host of unanswered questions here that just does not prove beyond a reasonable doubt that Mark was the one who inflicted those injuries. And I think that this dovetails nicely into the ineffective assistance argument, because it's understandable that the jury in this case wants to hold someone accountable, and there was just a whole host of unanswered questions. And the fact that defense counsel allowed the jury to hear that Mark was bipolar and had been in jail, and in closing- I don't think attorneys allow people to hear evidence. I think you've got to be a little bit more clear. Are you saying that the attorney didn't object or didn't move to strike? What is it the attorney could have done to keep the jury from hearing the evidence that you complain of? I apologize for that, Your Honor, for not being more clear. But, yes, of course, that's the trial court's job to decide whether the evidence is proper or not. In this situation where there were so many unanswered questions about the case, where the medical- where the state's evidence showed that these injuries could have been caused by a punch and not a fall, and due to just everything that I argued earlier about the questions here, the defense counsel should have objected to the testimony from Sarah that her brother Mark was bipolar, and defense counsel should also- Well, if it was a strategic decision, it was bad strategy. The trial court itself recognized the potential prejudicial nature of the fact that Mark had been in jail, and defense counsel did decide to try not to draw the jury's attention to that. But the fact is that the jury heard that testimony, and it's only wishful- Counsel, that's right down the middle of the fairway in terms of strategic decisions. You start with the assumption, okay, the jury has heard it. Do I make it better or worse by trying to address it to the jury, or do I let it pass? That's a fair question. That's a strategic decision. That's a fair question and a fair characterization. I agree. But in this particular case, with these particular facts, that's bad strategy because in a case where the jury is searching for an explanation as to what happened, I mean, let's be honest here. There's a lot of questions here, and the jury undoubtedly was confused about what the motive was, what happened here. I think the only way to cure that prejudicial testimony coming in was to have the court specifically instruct the jury to disregard it because without that instruction- I'm sorry, but I just want to ask this question because it goes towards the strategy on appeal here. I think you have framed the issue as ineffective assistance of counsel to not object. A portion of the ineffective assistance analysis is you have to establish prejudice, and the prejudice here is the jury heard this evidence, but even if counsel had objected, the evidence has already been presented to the jury. Wouldn't the more obvious claim on appeal, wouldn't it be that the defense counsel failed to file a motion and eliminate to prevent the introduction of evidence relating to him being in jail or having bipolar disorder? That would have prevented, assuming that it was inadmissible, would have prevented the jury from hearing it in the first place, but that's not what you've argued here. Well, that's certainly a good point, Your Honor, but there's no indication that the defense counsel had any idea that Sarah was going to make that testimony. But wouldn't she have been aware of the recording, the 911 recording? Wouldn't she have been aware of his mental health, that he had been diagnosed? Of course she would have. So those things were known in advance of trial. Witnesses would have been instructed, had a motion to eliminate been granted, would have been instructed not to mention those things. The recording would have been redacted to exclude the mention of jail. So, I mean, that would be trial counsel's responsibility, wouldn't it? Well, certainly that might have been an ideal course of action for defense counsel. But what we do have here is the fact that the jury did hear it. So then the next question is what to do. Our position is that it was unreasonable, it was not good strategy then to not instruct the jury, not have the court instruct the jury to disregard that evidence. And in particular, that's compounded by the jury then hearing that he had bipolar disorder, he's a felon, and then the defense counsel's closing argument, whether or not it's a concession, the fact is that defense counsel did tell the jury that people fight all the time, and that if Mark punched Frank, he didn't know that it was likely to cause great bodily harm or death. Didn't counsel go to some length to make clear that those arguments were raised if the jury found your client responsible for an altercation? I'm sorry to interrupt, Your Honor. Yes, that is fair, but the fact remains that it did put that picture in the jury's mind. And again, I keep coming back to the fact that in this specific case where there were so many unanswered questions and the jury's looking for answers, our position is that these three things were even more prejudicial because it then gave the jury some understanding and some rationale as to what might have happened. When it was unclear as to what the motive was and what happened and why, these three things gave the jury maybe the little nudge that it needed to find him guilty because it provided some explanation as to what might have happened. With no other explanation before it. You don't think that the jury could infer that the victim could have been struck or punched? You think that that was something that counsel had to explain to the jury? Well, they certainly could infer that the victim was punched, but the question is, who did it? Mark had no injuries on his hands. And counsel didn't concede he did. I don't think it matters that he conceded. I think what the problem is, is that that puts in the jury's mind a picture of what happened, especially when the state's evidence showed it was a punch. Right. So it's already in their minds. How did counsel addressing that evidence, which was already in their minds, fall short of the obligations to represent your client? I can't see any strategic reason for putting it in the jury's mind that if Mark punched him, he didn't know it was going to cause death, especially in light of the state's lack of other evidence showing that Mark was the specific person who did it. Isn't mens rea something the jury had to infer? Isn't that part of the state's burden? Why wouldn't his attorney comment on that? The best strategy for defense counsel here in closing argument would have been to, well, first of all, is to not have let the jury heard that Mark had bipolar disorder because there was, you know, the jury had not heard anything about his mental illness before that. There was not an insanity defense put forth. There was no other evidence about that. They were just briefly told that and then it was left hanging there. So they didn't know what to do with it. And it wasn't schizophrenia. It was bipolar, which might have a different inference from it. That is true, but bipolar disorder is a mental illness that I think the regular or common person would know is characterized by extremes of low and high. And again, that could have provided the little nudge that the jury needed to make an explanation for this otherwise unexplained crime. It's a horrible crime. It's a very sad case. But the state's evidence falls short of proving that Mark was the specific person that did it. His mere presence there, even with a locked door, is not enough. And his behavior when he was asked to unlock the door. Well, I think we don't know the reason for that. I mean, the fact is, is that he had untreated schizophrenia at that time. And I don't think that we can apply. The jury didn't know that. You can't argue that inference. Well, certainly we can't argue both ways and say the jury should know about his mental illness, but say because he had a mental illness, we have to interpret his actions differently. Well, on appeal, the issue is whether Mark had a consciousness of guilt. And our argument is that we don't know that he had a consciousness of guilt due to a schizophrenia. We don't know why he didn't answer the door. It's just as easily explained by untreated schizophrenia as it is by some deliberate consciousness of guilt. I mean, the fact that he answered the door and acted calm and led the police right to Frank's room, I mean, that doesn't make any sense. Eventually. Yes, eventually. When he answered the door, he did. But the fact is, we don't know why he didn't answer the door. It's I think it's just as reasonable to assume that it was due to his untreated schizophrenia and not a specific consciousness of guilt. Okay, thank you, Mr. Z. You will have rebuttal. Ms. Wells, please proceed with your argument. Thank you, Your Honors. Counsel, may it please the court. I will start with the stipulation and the restoration hearing and move on to the other issues as we as we get to them. But the the first issue I want to talk about, Lewis, it is absolutely proper for a stipulation to be considered by the court as part of a restoration hearing. Lewis itself was a restoration hearing. Stipulation as to what? They stipulated to the admissibility of the report, not the conclusion, not the conclusions. And that is that is a very big difference in this case. And not only that, but both counsel indicated that it was up to the court to determine if. The defendant was fit and said, these are the next steps if the court makes that finding. So there was a there was an acknowledgement by both counsel. In addition, the court had before it, although we didn't question defense counsel, defense counsel volunteered that he had I'm sorry, she had had conversations with her client and that she didn't have any questions or concerns about fitness. So the court had additional information. Not only that, this defendant had appeared before this judge nine separate times and was there during the fitness restoration. I want to address the medication. So the Gibson court said that due process is generally satisfied when the court reads the report. We know the court did because the court acted upon the report. The court received the report on the six and based on reading that report and in order for the respond, the defendant to be returned to court for this fitness hearing to be held within 14 days, as is required by statute. So the Gibson court said that where the court has read the report, we know the court had where the court has its own observations of the defendant. The defendant had been before the court on nine separate occasions and was in front of the court on that day. Due process is generally satisfied. In addition, the court had counsel's representations that she had had conversations with the defendant and did not have any concerns about fitness. Now, the medication, the Zoloft was three years later. That comment and we don't have any information that this defendant wouldn't have been seen a psychologist, a psychiatrist, a medical personnel who had changed his prescription. The medications that are in the fitness report, let's remember the report was written and filed with the court on the six. And this hearing was less than two weeks later. So the court having some conversation with the defendant about, are you currently taking your medication? He was returned from the Department of Human Services to the jail. It's it is reasonable for the court to infer that he was still taking his medication. And the Goodman court specifically said that there are not any specific requirements in the statute or Supreme Court rule that the court has to make specific findings has to specifically question. And as Justice Steigman and Shaw said in his concurrence, if the court after having the report in front of it, after having the defendant in front of him, after having counsel say, I don't have concerns about fitness. The court could have gone back to what we know in Lewis, which is find him fit, find that he remained unfit or seek additional information. And as we know, the court is presumed to know and follow the law. I think that in the briefs, much was made about the court's verbiage of I'll go along with. And we addressed that in our brief that while that can have a yes, I'm going to go along with. It does not reflect passivity, it reflects agreement, unanimity, unanimity. There are a host of synonyms that that do not reflect passivity. So we believe that in this case, the restoration hearing reflected due process, and there should not be a remand. If there is a remand, it should be for a retrospective fitness hearing. That has become the norm. The timeframe on this and the real issue in a retrospective fitness hearing is whether the record contains sufficient evidence from knowledge that would be contemporaneous with the fitness hearing and the trial. And this record does reflect that. We have information from defense counsel. We have information from the court regarding its observations of the defendant. We have the report itself. We don't believe a new fitness hearing is required at all. But if this if this panel does believe that remand is necessary, it should be for a retrospective fitness hearing, which is the norm. If the court doesn't have any questions for me on issue one, I'll move on to the sufficiency. So when you look at the sufficiency, I know counsel has referred to not very strong evidence, but this was overwhelming evidence. We have a locked door. We have a 74 year old. We don't know when it was locked, right? That's correct. So it doesn't dispel the possibility that somebody exited the house and locked it on their way out. Which would have to be fairly unusual that somebody fleeing the scene of a brutal murder is going to lock the door behind them. And that is something for the jury to infer that that is an inference that the jury has to has to make. And it's a reasonable inference that if the door was locked, that that the victim had made a phone call at 830 in the morning, that the defendant is having is lying to the police about the victim. Would it be more correct to say that a phone call was made from the phone? We don't necessarily know the defendant. I'm sorry, the decedent placed that call. The evidence in the testimony was that it was Frank that made the phone call and that it was his voice. That was my recollection of the message on the message that the message was from Frank, although it wasn't that it wasn't. Understandable, but that would be certainly from for the jury to infer as well. And it is important. They're just so unclear. Your argument is that the record shows it was the decedent's voice, but the message itself was garbled or ambiguous or not understandable. Yes, the and let me get her name. The Bridget, right. And that is at 353 and 494 in the record where she talks about the voicemail that happened at 825 in the morning. She does say it's from Frank that that was the testimony. So, I, there wasn't a lot of detail about it can't be interpreted as being from his phone. That would be up to the jury to infer, but that was what the testimony was. And again, those are reasonable inferences from the jerk for the jury. That is for the trier of fact. And Tenney talks about the standard is the same, whether it is circumstantial or direct evidence that the inferences have to be made in the light most favorable to the prosecution. So, saying that, yes, there could be some other inference that somebody else made the phone call or somebody else locked the door. Those are inferences that were up to the jury to make, and they have to be made in this standard and reviewing the sufficiency of the evidence in the light most favorable to the prosecution. And in his brief, defendant argues that you can't rely on inferences and in Jackson versus Virginia itself, it talks about the reasonable inferences being drawn. The only restriction is that the inferences have to be reasonable. And the our Supreme Court in the Jackson case that I cited also talks about the jury doesn't have to look at all inferences and raise them to the level of reasonable doubt. So that's really what's being asked here. We have the inconsistent statements of the defendant to the officers showing consciousness of guilt. And while defendant may want to argue that the delay in answering the door or his explanations to the jury may be for some other reason, those are reasonable inferences that the jury could draw that this was consciousness of guilt. We have the defendant is the only person in a locked house, his delay in answering the door, and we have Frank being beaten to death. So to say that the jury could not draw those inferences just goes beyond credulity, because those are inferences that are reasonable. If you're the only person locked in the house with the person that was beaten to death, and just because there is not physical evidence does not mean that there wasn't sufficient evidence and the people cited cases as to that as well. The evidence was clear this was not caused by a fall. The defendant tried to say Frank fell sometimes intentionally. That was refuted. So when you look at all of the evidence put together, the inference that the jury was entitled to draw and did draw was that this defendant was the one that beat his 74-year-old father to death. He was the only one locked in the house and he delayed coming to the door for 30 minutes while they tried to get someone to answer the door. The other thing I want to point out is the admission of improper evidence, even if this court does find that that evidence was improper, the Furby case indicates that that does not overcome a finding of the sufficiency of the evidence. We had argued that that was a forfeited argument anyway, because there was no citation to authority that those items could not be considered as part of the sufficiency of the evidence. It wasn't that there wasn't an argument in argument three that as to defense counsel's effectiveness, but the Furby case is clear that even if there is improperly admitted evidence that can be considered as part of the sufficiency. Ms. Wells, had an objection prior to trial been made in the form of an eliminated motion to any testimony regarding him having been jailed, defendant having been jailed, or his mental health status, would that have been successful? In other words, was this evidence admissible? I don't believe that the mental health issue in the way that it came in, I don't believe would have been barred, because number one, just being bipolar does not in and of itself equate with other bad acts. And the fact was, just as she was explaining her father's medical condition, she was explaining her brother's mental illness, which was a medical condition, and saying, nobody's answering the door, these are the two people that live here, and I need someone to check on them. So that was the context in which it came in. This was her 911 call seeking assistance for the two people that lived in the house. I think something's wrong. And it came in during the officer's testimony as to his response to the house. So I don't believe that the mental illness would have been excluded, because it's part of the whole explanation of why the police responded. As to the jail, had there been a motion in limited advance? Yes, it probably would not have come in. But it was something that was volunteered in response to defense counsel's question. She moved on as a strategy, which is shown from the conversation in chambers. She discussed a mistrial. She discussed admonishments. And it was her choice after speaking with the defendant, not to seek a mistrial. She didn't think it would be successful. She didn't think that the testimony was that damaging. And she did not want admonishments because she didn't want to draw further attention to it. Now, in hindsight, other attorneys may disagree, but it is a valid strategy. And the Evans case says it's a valid strategy. This was a passing cryptic reference. And that was a strategy choice she made. Absolutely a strategy choice. And as to the closing argument, I will touch on that briefly. When you look at her argument in context, the whole first 10 pages of the transcript are her saying there's not enough evidence. We don't have to prove anything. Mark didn't do it. The defendant didn't do it. The defendant didn't do it. The state didn't prove he did. For the reasons I just argued, we had proven that. She even acknowledges this is strategy. I would not be doing my job if I didn't address the second prong of what needs to be proven. She's absolutely right. She wouldn't have been doing her job. And this was a strategy choice. Strategic decisions are not to be considered in hindsight, and counsel is supposed to be a deferential review. And so we do not believe that under any of these three bases, ineffective assistance of counsel has been proven, even on the first prong, that her performance was deficient because they were strategy decisions. As to the last issue, and I know counsel didn't get to the fourth issue, which is the sentencing, I do want to address that very briefly because the de facto life sentence, which is the focus of their argument, is really a term of art related to juveniles. It is an absolute false premise that the only question is whether the defendant should die in jail. That is just not the standard set by this court when you're not dealing with a juvenile offender. The court has to balance the relevant factors and make a reasoned decision as to the appropriate punishment in each case. That is the standard that has to be determined. So this court did exactly that. The court looked at his rehabilitative potential, found none, found no factors in mitigation, found multiple factors in aggravation. The sentence, because of Frank's age, was between 20 and 100 years. That was the range. And the court sentenced him to a mid-sentence range. So when you're looking at this under the plain error standard, you have to find an error to begin with. And this court didn't err when it considered all of the factors in aggravation, all of the factors in mitigation, and sentenced him within the appropriate range. Did not err in doing that. And specifically found his criminal history, found that even with the 21 class A misdemeanors, the repeat traffic that he normally didn't consider, that he didn't have rehabilitative potential in this case. So the sentence was appropriate. I do want to address the Allen case, which the main factor is supposed to be the severity of the offense. And in Allen, the case was breaking into a vehicle, taking some minor items, which were immediately returned. And the Allen court said, we have to look at the seriousness of the offense, which was trifling in that case. We don't have a trifling offense here. We have a brutal beating of the defendant's 74-year-old father. And based on all of that, the court did not err. And therefore, plain error review is not proper here. And we would ask that you affirm that you not send it back for a fitness hearing and that you find the evidence was sufficient and counsel was not ineffective. Thank you, Your Honors. Thank you, Ms. Zeeb. Excuse me. Thank you, Ms. Wells. Mr. Zeeb, do you have any rebuttal? Yes, I do. Thank you, Your Honor. I believe that my reply brief covers all the arguments that counsel made, but I would appreciate a few minutes to briefly touch on a few things in more depth. Thank you. As to the first issue, counsel cites to Lewis to support her position. But Lewis held that basically, even if it was proper to stipulate to the report's admissibility, that the parties still have to show, or the record still has to show, that the court reviewed the report underlying that stipulation. It's got to give details about the basis for its finding. Counsel, it's a two-page report, and it's the reason the judge ordered the restoration hearing, right? No. Why do we have to have him say out loud, I read the report? It wasn't, I mean, it was the, because this is a restoration hearing, Your Honor. This is not an initial fitness determination. That's what distinguishes our case from Goodman. No, but the only question is whether he read the report. And I'm trying to figure out why, when he ordered the hearing, after a motion with the report was filed, or he apparently based the decision to order the restoration hearing on the report, why would we question that he read it? Because the court receiving the report, and then just kind of rotely setting it for a restoration hearing, doesn't show that the court read the report, thought about the report, and then exercised its independent discretion in determining that Mark's fitness had been restored. So if the judge had said, I've read the report, does your argument collapse? No, it helps the state's case. That's one part of it. I think that in this case, this is a very particular case. We're not saying that the courts have to do this in every circumstance. But here, the court should have indicated on the record that it read the report. Two, it needed to verify on the record by some party, either defense counsel or the court itself, questioning Mark, are you taking your medications as prescribed? It could have been yes or no, very easy. And then the court should have on the record said, I'll go along with the stipulation, but my determination is based on A, B, and C. Again, that could have taken two minutes. But with this record, we can't just assume that the court read the record. We can't just assume that Mark was taking his meds in Cook County Jail. I mean, this is not a fancy hospital where some rich person is on a specific protocol. This is Cook County Jail. At the very least, Mark's due process rights required for the court to verify that he was taking his meds. And then going on to whether, if this court agrees, it should just be sent back for a retrospective restoration fitness determination. The counsel doesn't cite a case that this is not a norm. In fact, Esang and Neal, which are the controlling cases, Esang holds that it is not the norm. That the norm is that it would not satisfy due process to just order a retrospective restoration fitness hearing. Here, it's four years since that very rote fitness restoration hearing. So, if this court agrees that what the court did here did not comply with this court's own precedent in Gillen and Lewis, the Illinois Supreme Court precedent, then the proper remedy should be to reverse and remand for a new trial. I'd like to touch briefly on the second issue, too. I think it's important also to point out that there were evidence did show that people were going in and out of that house the night before and that morning. And again, we don't know who locked the door. It's not necessarily the perpetrator of the offense who locked the door. We don't know. Maybe Mark locked the door, but he wasn't the person that caused these injuries. But the point is, that's just kind of speculation. And whether it was Frank that called Bridget or someone else using Frank's phone, I think that's immaterial. Because whether it was Frank who left a garbled message or someone else, the fact is that that doesn't tend to prove that Mark was the person who inflicted these very specific, extensive injuries to his father. If the court has no further questions, which it doesn't seem like it does, thank you for listening to my argument. I respectfully request that, pursuant to argument two, this court reverses conviction outright. Pursuant to arguments one and three, that it reverses conviction and remand for a new trial. Thank you, Your Honors. Thank you. Okay, thanks to both of you. The case is submitted and the court now stands in recess.